## 883.  BENNETT *v.* WARE.

1. One who professes to "heal the sick without the use of medicine," but "by placing his hands upon that portion of the body that is affected by pain," the healing resulting from "magic power given direct from the Lord," is not a medical practitioner, and such treatment of the sick is not the "practice of medicine," as defined and regulated by the statutes of this State.

2. The purpose of the statutes regulating the practice of medicine is to protect the public against quack medical practitioners who use drugs

and medicines in treating disease. These statutes do not include those who in their method of treatment eschew all use of drugs or medicine.

3. Those who profess to heal the sick by magic, psychic, or supernatural agency may be impostors, but they are not physicians, and their system is in no sense the practice of medicine.

4. Prima facie, a "magic healer" who takes the money of the sick is engaged in a fraudulent practice; and one who in good faith endeavors to stop such practice, by having the "magic healer" prosecuted for violating the statute regulating the practice of medicine, is not liable in damages for malicious prosecution.

Action for malicious prosecution, from city court of Fitzgerald— Judge Jay. November 27, 1907.

Argued February 4,—Decided May 7, 1908.

*Hendricks & Christian, M'Donald & Quincey, W. R. Smith, J. C. Smith, L. M. Burns,* for plaintiff, cited: Political Code, §§1477-1581; Acts 1894, p. 88, sec. 9; 112 *Ga.* 338; 22 A. & E. Enc. L. (2d ed.) 786-8; 9 Ohio Dec. 222; 20 R. I. 632; 40 Neb. 158; 109 N. C. 864; 24 Ont. 561; 4 Brit. Columbia, 308; 34 L. T. N. S. 76; 62 Wisc. 207 (51 Am. R. 722); 69 Ill. App. 654; 175 Mass. 48; 55 Minn. 20; Civil Code, §§3843-5, 3848-50; 102 *Ga.* 264; 67 *Ga.* 58; 31 *Ga.* 331; 92 *Ga.* 421; 89 *Ga.* 367; 9 Mich. Dig. Ga. R. 159.

*Eason & Bull,* for defendant, cited: Civil Code, §147 et seq.; 112 *Ga.* 338; 22 Am. & Eng. Enc. L. (2d ed.) 785; 40 Neb. 158; 70 Mich. 6; Webst. Int. Dict., "Osteopathy."

HILL, C. J. The plaintiff in error was arrested on a warrant sworn out by the defendant in error, charging him with practicing medicine without a license, in violation of the statutes of this State. On a preliminary investigation he was discharged, and thereupon he brought suit against the defendant in error for malicious prosecution and false imprisonment. In the petition he alleges, that at the time of his arrest and incarceration in the common jail he was engaged in the "profession of healing diseases without the use of medicine, commonly and better known as a magic healer;" that he "heals the sick without the use of medicine in any form or manner whatever, by placing his hands upon that portion of the body that is affected by pain; that this gift or magic power is given him direct from the Lord;" that he made no charge for his services, but accepted such compensation as the gratitude of his patients induced them to voluntarily offer; and that as a result of his arrest and prosecution for practicing medicine with-

out a license, he suffered great humiliation and mortification, lost two days compensation in "gifts," amounting to $25 per day, was put to an expense of $15 in employing a lawyer to defend him against the untruthful accusation, and in fact "lost almost his entire practice;" that his prosecution was malicious and without probable cause, and he claims to have been damaged in the sum of $5,000. A demurrer was filed to this petition, on the ground that the allegations showed that the plaintiff was in fact practicing medicine and suggesting remedies for the sick and afflicted, and receiving compensation therefor, without complying with the statutes of the State regulating the practice of medicine, and, therefore, that there was probable cause for his arrest and prosecution. The demurrer was sustained, and this judgment comes to this court.

The direct question for determination is, whether the plaintiff, under the facts set out in his petition, was engaged in the practice of medicine as defined by the statutes of this State. He insists that his practice is neither within the letter nor the spirit of the law. By virtue of its police power, the State has enacted legislation to protect the public against unfit and incompetent practitioners of medicine, and to prevent the hurtful results of malpractice. A construction of this legislation will determine the issue made by the record. Section 1477 of the Political Code prescribes who shall be authorized to practice medicine in this State. The practicing physician is required to have "a diploma from an incorporated medical college, medical school, or university," or shall be one who has been "in active practice of medicine since the year 1866," after having attended "one or more full terms at a regularly chartered medical college," "or who was by law authorizeed to practice medicine in 1866, or shall have been licensed by the medical board." It is further provided, that the Governor of the State shall appoint three separate boards of medical examiners, each board to consist of five members selected from the three schools or systems of medicine designated by the statute, to wit, the "regular" or allopathic school, the homeopathic, and the eclectic school. Persons who desire to practice medicine and who are graduates of any incorporated medical college, school, or university requiring the designated course of study, are to be examined by one of these boards, the graduate of a particular school to be examined by the board composed of practitioners of that school.

But if the applicant desires to practice a system not represented by any one of the three boards, he may elect for himself the board before which he will appear for examination. When the examination is satisfactory, the applicant is granted a certificate allowing him to practice medicine upon complying with the law in reference to registration. Polit. Code, §§ 1479, 1482, 1486. Section 1478 of the Political Code undertakes to define the practice of medicine. "The words 'practice medicine' shall mean, to suggest, recommend, prescribe or direct, for the use of any person, any drug, medicine, appliance, apparatus, or other agency, whether material or not material, for the cure, relief, or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound, fracture, or other bodily injury or any deformity, after having received or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, or compensation." Section 1490 declares, that "any person shall be regarded as practicing medicine or surgery, within the meaning of this Article, who shall prescribe for the sick or those in need of medicine or surgical aid, and shall charge or receive therefor money or other compensation or consideration, directly or indirectly."

In construing these statutes, it is apparent that the law of this State recognizes only three systems or schools of medicine,—the "regular," the homeopathic, and the eclectic schools. It is impossible for one who desires to practice any other system to do so in this State as a practitioner of medicine, because, under the law, he can not procure a license. In other words, the law only proposes to grant a license to practice medicine to the allopath, the homeopath, or the eclectic. It is true, the statute provides that "if the applicant desires to practice a system not represented by any of the" three boards, "he may elect for himself the board before which he will appear for examination." (§ 1486) ; but this is a barren privilege, for none of the three boards can or will examine any applicant except one who has a diploma from a regular medical college, or who proposes to practice one of the three systems. For instance, none of the boards will recognize a diploma of an osteopath, issued by an osteopathic school, because such school is not a regular school, and none of the boards would be competent to examine the osteopathic applicant on the system that he had studied, and the applicant would not be competent to pass

an examination in any of the systems represented by the boards, for such systems formed no part of his curriculum. It would be absurd to say that one who practiced the healing art by magnetism, Christian Science, spiritism, hypnotism, mesmerism, or any other form for the treatment of disease, based upon a supernatural agency, would be entitled to be examined by any one of the medical boards of the State; for the science of medicine is based on natural agencies. We therefore conclude that only those who propose to practice medicine by one of the schools or systems recognized by the statutes of this State are required to have a license.

But it is said that § 1478 of the Political Code, supra, undertakes to define the practice of medicine, and that this definition embraces the particular practice of the plaintiff in error. He expressly disclaims the use of medicine in any form whatever, in his treatment of diseases, and therefore he must be excluded from the specific words of the definition, because he did not suggest, recommend, prescribe, or direct the use of any drug or medicine, appliance, or apparatus. According to his statement his method consisted simply in laying his hands on the sick at the point or place of pain or disease, and the healing which followed was by a direct divine agency. Do the words in the statutory definition above given, "or other agency, whether material or not material, for the cure, relief, or palliation of any ailment or disease of the mind or body," embrace an agency of this character? It may be conceded that the words "material or not material" are sufficiently broad to include at least every human or natural agency. But was it intended by the legislature to denominate as a medical agency, whether material or not material, an agency claimed to be supernatural? It is true that faith on the part of the sick is a potent influence in all treatment of disease; but can it be said that faith is an agency? Are the sick who may be cured by magnetism, mesmerism, or hypnotism cured by any medical agency; or is an answer to prayer such an agency, and the person who prays practicing medicine? We can not believe that the legislature intended to include in the practice of medicine what may be called psycho-therapeutics, or any form of the treatment of the sick which makes faith the curative agency. But the words "other agency," "material or not material," should be construed in obedience to the maxim "noscitur a sociis," and the meaning of the

word "agency" must be limited by the associated words "drug, medicine, appliance, apparatus." In other words, the word "agency," even as qualified by the words "material or not material," was intended by the legislature to mean a substance of the general character of a drug or medicine, or surgical apparatus or appliance, the obvious purpose being to protect society against the evils which might result from the use of drugs and medicines by the ignorant and unskilful. The purpose of the act is clearly indicated by its title, "to regulate the practice of medicine." It was not intended to regulate the practice of mental therapeutics, or to embrace psychic phenomena. These matters lie within the domain of the supernatural. Practical legislation has nothing to do with them. If they are a part of a man's faith, the right to their enjoyment can not be abridged or taken away by legislation. However the so-called wisdom of this world may regard these things, it can not be denied that long before the Saviour told his disciples that in His name they should heal the sick and prevent all manner of diseases by the laying on of hands, the practice of healing by means of prayers, ceremonies, laying on of hands, incantations, hypnotism, mesmerism, and other forms of psycho-therapeutics existed. To the iconoclast who denounces these things as the figments of superstition, or to the orthodox physician who claims for his system all wisdom in the treatment of human malady, we commend the injunction of Him who was called "the Good Physician," when told that others than His followers were casting out devils and curing diseases: "Forbid them not." What matters the system, if in fact devils are cast out and diseases are healed?

Going back to the question now under consideration we deduce the following proposition: that the practice of medicine, defined by the code, supra, is limited to prescribing or administering some drug or medicinal substance, or those means and methods of treatment for prevention of disease taught in medical colleges and practiced by medical practitioners; that the purpose of the act regulating the practice of medicine was to protect the public against ignorance and incompetency, by forbidding those who were not educated and instructed as to the nature and effect of drugs and medicine, and for what diseases they could be administered, from treating the sick by such medical remedial agencies; that

the law is not intended to apply to those who do not practice medicine, but who believe with Dr. Holmes, that "it would be good for mankind, but bad for the fishes, if all the medicines were cast into the sea," nor to those who treat the sick by prayer or psychic suggestion. In the language of Chief Justice Clark, "Medicine is an experimental, not an exact, science. All the law can do is to regulate and safeguard the use of powerful and dangerous remedies, . . but it can not forbid dispensing with them." "All the law so far has done or can do is to require that those practicing on the sick with . . drugs shall be examined and found competent by those 'of like faith and order.'" State v. Biggs, 133 N. C. 729 (64 L. R. A. 139, 98 Am. St. Rep. 741, 46 S. E. 401). We are therefore clear that the plaintiff in error was not a practitioner of medicine in the sense of our statute or in the popular sense; and the fact that he received fees and compensation for treatment, in the shape of gifts, could not make what would otherwise not be the practice of medicine a violation of the statute regulating such practice, for it must be apparent that if the mere laying on of hands amounts to the practice of medicine in any sense, it is so without reference to fee or reward.

In the view herewith presented we are strengthened by the decisions of courts of last resort in this country construing similar statutes. Osteopathy, a system of treating disease without the use of medicine in any form (which has made great advances in recent years, and, if the testimony of many intelligent men and women is to be believed, has worked many cures) has been frequently held not to be included in the term "practice of medicine or surgery," and, therefore, not included in the statute regulating the practice of medicine and surgery. The earliest case on the subject is that of Smith v. Lane, 24 Hun, 632, in which the Supreme Court of New York held that the practice of osteopathy was not included in the statute which declared it to be a misdemeanor for any person to practice medicine or surgery who was not authorized to do so by a license or diploma from some chartered medical school, State board of medical examiners, or medical society. This decision was based upon the idea that under the statute of New York no one would be issued a license to practice medicine unless he had a diploma from a regular medical college, the court giving to the words "practicing medicine" their usual, ordinary, and popular significance, and

asserting, that the purpose of the act was to prevent incompetent
or unqualified persons from administering or applying medical
agencies, or performing surgical operations that might be danger-
ous to the health, as well as to the lives of the persons treated or
operated upon, and that the purpose of the statute was to confine
the use of medicines and the operation of surgery to a class of per-
sons who, upon examination, should be found competent and qual-
ified to follow these professional pursuits, but that no such dan-
ger could possibly arise from the treatment of an osteopath, and,
for that reason, no necessity existed for interfering with his pur-
suit by legislative action.    A similar ruling was made in the case
of an osteopath by the Supreme Court of Ohio, in the case of State
*v.* Liffring, 61 Ohio St. 39 (46 L. R. A. 334, 76 Am. St. Rep. 358,
55 N. E. 168).    The Ohio statute entitled "an act to regulate the
practice of medicine," in defining the "practice of medicine," uses
the words "prescribe, direct, or recommend for the use of any per-
son any drug or medicine, or other agency."    That court held that a
"system of rubbing and kneading the body," commonly known as os-
teopathy, for the treatment, cure, and relief of diseases and bodily
infirmities, was not an "agency" within the meaning of the statute.
The Supreme Court of Kentucky, in Nelson *v.* State Board of
Health, 108 Ky. 769 (57 S. W. 501, 50 L. R. A. 383), held, that
one who practices osteopathy, not using medicine or surgical ap-
pliances, is not engaged in the practice of medicine within the
meaning of the statute requiring a license for such practice, the
language construed being, "to open an office for the practice of
medicine, or to announce to the public in any way a readiness to
treat the sick or afflicted, shall be deemed to engage in the practice
of medicine within the meaning of this act;" and that this language
referred only to those essaying to practice medicine proper, by the
use of drugs.    In the case of the State *v.* McKnight, 131 N. C.
717 (42 S. E. 850, 59 L. R. A. 187), the Supreme Court of that
State held that an osteopath was not embraced within the term
"practice of medicine."    Chief Justice Clark, speaking for the
court, says, "The State has not restricted the cure of the body to
the practice of medicine and surgery—'allopathy,' as it is termed
—nor required that before any one can be treated for any bodily
ill, the physician must have acquired a competent knowledge of al-
lopathy, and be licensed by those skilled therein.    To do that would

be to limit progress by establishing allopathy as the State system of healing, and forbidding all others. This would be as foreign to our system as a State church for the cure of souls. All the State has done has been to enact that when one wishes to practice medicine or surgery, he must, as a protection to the public (not to the doctors), be examined and licensed by those skilled in surgery and medicine. . . The State can only regulate for the protection of the public. There is also 'divine science' (which some one has said is neither divine nor a science), and there may be other methods still. Whether these shall be licensed and regulated is a matter for the lawmaking power to determine. Certainly a statute requiring examination and license before beginning the practice of medicine or surgery neither regulates nor forbids any mode of treatment which absolutely excludes medicine and surgery from its pathology." In a subsequent case, the same court, by the same learned jurist, in a very elaborate opinion, reaffirmed the decision in the McKnight case, declaring that one who holds himself out as curing diseases by a system of drugless healing without medicine or prescription, and who charges and receives fees therefor and has no license, is not guilty of practicing medicine or surgery without license. State v. Biggs, supra. The Supreme Court of Mississippi, in the case of Hayden v. State, 81 Miss. 291 (95 Am. St. Rep. 471, 33 South. 653), in construing a statute in totidem verbis as the statute of this State, declared that it did not apply to an osteopath who used no drug or medicine, and that the word "agency," used in the statute, was not intended to include such treatment. Many other courts, construing statutes substantially similar to ours, have made like decisions.

We admit that there are some decisions that hold the contrary; but we believe that the better rule, and one more in consonance with reason and in harmony with the republican character of our institutions, is, that all statutes for the regulation of the practice of medicine can be sustained only on the ground that they are necessary to protect the public against quack medical practitioners and impostors who prescribe drugs and medicines in treating diseases, and that these statutes are not directed against or intended to include those who eschew the practice of medicine altogether, but advance some new theory, such as osteopathy, for the alleviation of pain and the curing of the sick, or those who heal or pre-

tend to heal the sick by any form of mental therapeutics, such as Christian science, magnetic treatment, hypnotism, and the like. As to the science of osteopathy it may be remarked that a majority of the States have, by appropriate legislation, recognized it as a legitimate treatment of the sick, and as not included within existing statutes regulating the practice of medicine. We think these constitute legislative precedents in favor of the construction which we place upon the act in question; and we think further that the medical profession, represented by the medical boards of this State who are charged with the duty of enforcing the law which regulates the practice of medicine, gives the same construction to the statute, in its omission to interfere with the rapidly increasing practice of osteopathy. We would not be understood as meaning to embrace the osteopath in the same class with the magnetic healer. The practice of osteopathy is entirely antithetic to magnetic healing. The former relies entirely upon natural agencies,—indeed, we may say physical agencies; while the latter relies solely upon the supernatural. We cite the decisions construing osteopathy, as illustrations of our construction of the statute defining the practice of medicine, the argument drawn therefrom being that if the practice of osteopathy, which does require a knowledge of anatomy, physiology, pathology, and what may be called the fundamentals of medical and surgical practice, is not included in such statutes, the practice of the "magic healer" certainly can not be. In the language of the Supreme Court of Mississippi, "A wise legislature some time in the future will doubtless make suitable regulations for the practice of osteopathy, so as to exclude the ignorant and unskilful practitioners of the art among them. The world needs, and may demand, that nothing good or wholesome shall be denied from its use and enjoyment." Hayden *v.* State, supra. The Supreme Court of Rhode Island, in the case of State *v.* Mylod, 20 R. I. 632 (20 Atl. 753, 41 L. R. A. 428), holds that the practice of Christian science is not the practice of medicine, and is not included within the act regulating the practice of medicine.

We therefore hold, that under the allegations of the petition, the plaintiff in error was not engaged in the practice of medicine, and therefore was not violating the law regulating such practice in this State. But we do not think that the plaintiff in error was entitled to recover damages for malicious prosecution from the physi-

cian who swore out the warrant against him. The question of law involved was sufficiently in doubt, in its application to his practice, to fully warrant a legal investigation of the question; and in taking out the warrant the defendant was fully justified by the existence of probable cause, and his act was without malice, but in behalf of the public. Besides, we think that the practice of the plaintiff in error, while not in violation of the statute regulating the practice of medicine, was presumptively an imposition upon the credulity of the public, which might in its consequences result in much injury, and that he was exercising a pretended power of magnetic healing, to the deception of the people, and was obtaining their money in the shape of gifts under false pretenses, and we do not think that the law should permit him to recover damages resulting from a legitimate effort on the part of a citizen to test the legality of his practice. We therefore affirm the judgment of the court below in sustaining the demurrer and dismissing the petition.

*Judgment affirmed. Russell and Powell, JJ., concur specially.*

POWELL, J. I concur, but my concurrence is really a dissent from the views so ably propounded by Chief Judge Hill in his opinion. I think that the petition shows that the plaintiff, at the time of his arrest, was violating our statute against the illegal practice of medicine. Certainly he was not practicing medicine in the ordinary and popular meaning of that expression; but the framers of our statute were not content with that meaning and gave the phrase a new and enlarged definition. According to §1478 of the Political Code, "the words 'practice medicine' shall mean, to suggest, recommend, prescribe or direct, for the use of any person, any drug, medicine, appliance, apparatus, or other agency, *whether material or not material* for the cure, relief, or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound, fracture, or other bodily injury or any deformity, after having received or with intent of receiving therefor, either directly or indirectly, any *bonus*, gift, or compensation." If the definition had omitted the words italicised, then the word "agency," under the rule of construction denoted by the phrase noscitur a sociis, would be held to mean some agency of the same nature as drugs, medicines, and appliances, all of which are material agencies; but with the palpable purpose of forbidding any such con-

struction, the legislature added the words "whether material or not material." Since in the practice of medicine as popularly understood, and as regulated by the statutes of most States, only material agencies are used, it becomes manifest that the object of our statute was to regulate not only the ordinary practice of medicine, as it is usually subjected to regulation, but also every imaginable practice by which human ingenuity should be likely to undertake to palliate or cure those physical "ills which flesh is heir to." The words "material" and "not material" are absolute contradictories, in that they exclude all middle ground and together include everything thinkable. Human ingenuity is so multiform in its manifestations, and the professing of means to cure diseases of the human mind and body furnishes such a fertile field for its display, that in dealing with the question the lawmakers found it necessary to eschew specific enumerations and to employ the broadest and most comprehensive language.

I can not agree to the proposition that the object of this statute is only to forbid quacks from pretending to be regular physicians when they are not so. The right of the legislature to say by what systems and by what classes of persons diseases shall be treated springs from the police power, of which the health and safety of the people are wards. Just as the legislature may prescribe how plumbing shall be done, of what materials and by what class of persons (*Felton* v. *Atlanta,* ante, 183, 61 S. E. 27), and may thereby exclude other methods, which may in fact be just as efficient though not believed by the law to be so, and may prohibit from working in this profession men who are just as competent as the recognized and licensed plumbers, but who have not in the statutory method proved themselves to be so, so it may limit the methods by which diseases are to be treated and may exclude every one from attempting to heal them who does not prove himself competent according to the method which the law itself believes to be the fairest and most expedient for testing his competency. I was about to draw a parallelism between the "magic healer" method of dealing with the problem of sanitary sewerage and that same method of dealing with disease, but the very statement of the first proposition would be too nonsensical and ridiculous to be judicial. The law ·is as much interested in protecting the lowly of intellect from the superstitious handling of disease as in protecting them from the preten-

tious knowledge of the quack. If every citizen of the State were capable of exercising an intelligent discrimination as to the capacities of those who offer to treat human ills, then the interference of the legislature would be an act of supererogation. Only the ignorant or the superstitious need protection. Those principles of laisser-faire which would forbid State interference to protect the weaker citizenship from their very weaknesses have never received much recognition in Georgia. The ignorant and superstitious parent who takes his child, critically ill, to a "magic healer," when he should seek the advice and treatment of some skilled physician, and thereby lets it die, has done the perpetuation of the race the same injustice as if he had taken a knife and stabbed the child to the heart. Contemplate the effect on the community if a scourge of smallpox or yellow fever should fall upon it and the people should submit themselves to the care of "magic healers," instead of physicians. The State has an interest in the mental and physical condition of its every citizen.

It may be that the statute which the law-making power has seen wise to enact excludes from the right to undertake the healing of the people some whose methods are rational, and who therefore ought not to be excluded; osteopathy may be an efficient system for the cure and palliation of fleshly ills,—indeed, I think it probably is; there may be other systems equally good, but now forbidden; if so, the legislature should authorize them; but so long as that branch of the government to which this question is addressed says they are noxious to the public health, I feel that we, as judges, should hold them to be unlawful. My idea is that if any person, not having complied with the requirements of the statute, shall "suggest, recommend, prescribe or direct, for the use of any person any . . agency, whether material or not material for the cure, relief, or palliation of any ailment or disease of the mind or body, . . after having received or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, or compensation," he is guilty of a misdemeanor; and that the plaintiff, who confesses in his petition that "his profession is and was at the time of his arrest . . that of healing diseases, without the use of medicine, commonly and better known as a 'magic healer,'" and that at that time he had a "lucrative practice" in several counties, conclusively shows that probable cause existed for his arrest for a

violation of the statute. It boots not that the plaintiff points to the prophets and apostles and says "it is a matter of Christian right." If so, let him give the powers without price. "Freely ye have received, freely give," was Christ's command, as He gave His apostles miraculous power over disease and death. Simony is equally abhorrent to the divine as to the civil law. So witness Simon Magus; also Gehazi, servant of Elisha, who took the talents and changes of raiment which his master refused for curing Naaman's leprosy, and therefor suffered the master's curse and "went out from his presence a leper as white as snow."

I thoroughly agree with the Chief Judge in the opinion that irrespective of the question whether the plaintiff was violating the statute, he set out no cause of action. He bases his right to damages on the breaking up of his business. If he had any divine power and was selling it—a proposition absolutely absurd to the present-day mind—he was guilty of the common-law offense of simony; and while common-law crimes are not punishable as such, they are usually, civilly speaking, so unlawful even now, under our adoption of the common law, that they can not afford the basis of a cause of action in favor of the perpetrator. If he was taking money and professing to heal, and did not heal, he was a cheat and swindler. If he used material agencies and healed, he violated the statute regulating the practice of medicine. In any view his cause of action arose from an unlawful act, and he can not recover. *Robertson* v. *Porter,* 1 *Ga. App.* 223 (57 S. E. 993).