# BOARD OF MEDICAL EXAMINERS OF STATE OF UTAH v. FREENOR.

No. 2794. Decided January 14, 1916. (154 Pac. 941.)

1.  PHYSICIANS AND SURGEONS—PRACTICING WITHOUT AUTHORITY—INJUNCTION—POWER OF COURT. Under Comp. Laws 1907, Section 1737, providing that any person practicing medicine, surgery, or obstetrics within the state contrary to law may, at the instance of the board of medical examiners, be enjoined from practicing until lawfully admitted to practice, the district court had equitable jurisdiction, on complaint of the medical examiners, to grant injunction against a chiropractor practicing medicine, as the Legislature has power to change, abolish, or enact rules of equity, as in the instant case by authorizing restraint of a public offense. (Page 432.)

2.  PHYSICIANS AND SURGEONS—PRACTICE OF MEDICINE—STATUTE—"CHIROPRACTIC" — "PRACTICING MEDICINE"—"DIAGNOSE." Under Laws 1911, c. 93, providing that any person shall be regarded as practicing medicine who shall diagnose, treat, operate upon, prescribe or advise for any physical or mental ailment or any abnormal mental or physical condition of another after having received or with intent to receive any compensation, or who

shall hold himself out as a physician or a surgeon, a "chiropractor," one professing a system of manipulations which aims to cure disease by the mechanical restoration of displaced or subluxated bones, especially the vertebrae, to their normal relation, who advertised as a "Graduate Chiropractor. No drugs, no surgery, or osteopathy. Try chiropractic"—and who endeavored not so much to cure ailments as to permit the natural "vital forces of the body," impeded by luxation of vertebrae, to proceed unhindered to any diseased part upon readjusting the displaced vertebrae with his bare hands, for which he received compensation, was "practicing medicine" within the statute, since he "diagnosed" the symptoms of his patients by recognizing the presence of disease from its signs or symptoms in deciding as to its character, and thereafter treated them for compensation. (Page 434.)

Appeal from District Court, Second District; *Hon. J. A. Howell*, Judge.

Suit by Board of Medical Examiners of the State against

F. J. Freenon. Judgment for plaintiff, defendant appeals.

AFFIRMED.

*A. E. Pratt* and *George Halverson* for appellant.

*A. R. Barnes, Attorney Gen.*, and *J. C. Davis, Dist. Atty.*, of *Ogden* for respondent.

### RESPONDENT'S POINTS.

The legislature can enact new rules of equity, which would give the Court power to grant injunctions, which it otherwise would not have had. (*Allopathic State Board of Medical Examiners* v. *Fowler*, 24 So. 809 [Ala.] ; *Littleton* v. *Fritz*, 65 Ia. 488; 22 N. W. 642; *State Tax Law Cases*, 54 Mich. 350, 20 N. W. 493; *State ex rel Cutris* v. *Durein*, 46 Kan. 695, 27 Pac. 148; *State* v. *Jordan*, 72 Ia. 377, 34 N. W. 285; *State ex rel Rhodes* v. *Saunders*, 66 N. H. 39, 25 Atl. 588; *Brennan* v. *Roberts*, 125 Ia. 615, 101 N. W. 460; *Ohlrogg* v. *District Court*, 126 Ia. 247, 99 N. W. 178; *Ex parte Allison*, 90 S. W. 870, 2 L. R. A. [N. S.], page 1111.)

STRAUP, C. J.

The defendant, upon a complaint filed by the state board of medical examiners, was enjoined from practicing medicine within the state until he obtained a license. He appeals. His chief complaints are that injunction will not lie, and that the proved committed acts did not constitute practicing medicine within the meaning of the statute. Any person practicing medicine within the state without a certificate or license is guilty of a misdemeanor. C. L. 1907, Section 1739. "Practicing medicine" is defined thus:

"Any person shall be regarded as practicing medicine within the meaning of this title, who shall diagnose, treat, operate upon, or prescribe or advise for, any physical or mental ailment or any abnormal, mental or physical condition of another, after having received or with the intent to receive therefor, either directly or indirectly, any fee, gift, compensation or other pecuniary benefit, reward or consideration; or who shall hold himself out by means of signs, cards, advertisements or otherwise, as a physician or surgeon," etc. Laws 1911, p. 135.

It further is provided (C. L. 1907, Section 1737) that:

"Any person practicing medicine, surgery, or obstetrics within the state contrary to law may, at the instance of the board [medical examiners] herein created appearing as plaintiff in the district court, be enjoined by said court from practicing medicine, surgery, or obstetrics in this state until such person shall have been by said board lawfully admitted to practice," etc.

The case was tried to the court, who found the issues in favor of the plaintiff. The first point made is that the alleged, and found facts, if they constitute practicing **1** medicine within the meaning of the statute, were criminal, and not invasions of property rights, and that equity will not lend its aid by injunction to restrain mere violations of public or penal statutes, except so far as it may be incidental to its enforcement of property rights or other matters of equitable cognizance. To support this numerous cases and authorities are cited, among them 1 High on Injunction (4th Ed.) Section 20; 6 Pomeroy's Equity, Section 644; 22 Cyc. 902; *Taylor* v. *Marshall*, 255 Ill. 545, 99 N. E. 638; *Tiede* v.

*Schmeidt,* 99 Wis. 201, 74 N. W. 798; *Ewing* v. *Webster City,.*
103 Iowa 226, 72 N. W. 511. It is not made to appear that
there, as here, express authority by statute was conferred to
grant relief in the particular instance by injunction. We need
not inquire whether, in the absence of the statute, equity had
jurisdiction. It is not claimed that the statute is unconsti-
tutional. It is claimed that it in no manner conferred equitable·
power which the court theretofore, under its general power,.
did not have. We think the statute enlarged the power. As·
to this the court, in the case of *Allopathic State Board of*
*Medical Examiners* v. *Fowler,* 50 La. Ann. 1358, 24 South.
809, said:

"The General Assembly, having the authority to attach prior con--
ditions to the practice of medicine, was vested with the right to
enforce enactments on that subject by prescribing penalties for vio-
lations of the same, either by fine, by imprisonment, or by civil reme-
dies. The right to practice medicine being conditioned by law upon
the prior obtaining of a certificate from a medical board, plaintiffs
were clearly authorized [under an act], when they had reason to·
believe that defendant was violating the law in this respect, to test
the facts of the case through injunction."

Supporting this are also the cases of *Ex parte Allison,* 99·
Tex. 455, 90 S. W. 870, 2 L. R. A. (N. S.) 1116, 122 Am. St.
Rep. 653; *Sumner* v. *Crawford,* 91 Tex. 132, 41 S. W. 994;
*State ex rel Duensing* v. *Roby,* 142 Ind. 168, 41 N. E. 145, 33·
L. R. A. 213, 51 Am. St. Rep. 174; *Mugler* v. *Kansas,* 123 U. S.
623, 8 Sup. Ct. 273, 31 L. Ed. 205; *Eilenbecker* v. *Plymouth*
*County,* 134 U. S. 31, 10 Sup. Ct. 424, 33 L. Ed. 801; *Ohlrogg·*
v. *Smith,* 126 Iowa, 247, 99 N. W. 178; *State ex rel* v. *Durein,.*
46 Kan. 697; *North American Insurance Co.* v. *Yates,* 214 Ill.
272, 73 N. E. 423. These cases and the following, *Littleton*
v. *Fritz,* 65 Iowa 488, 22 N. W. 641, 54 Am. Rep. 19, *State·*
*Tax Law Case,* 54 Mich. 350, 26 N. W. 493, and *State* v. *Saun-*
*ders,* 66 N. H. 39, 25 Atl. 588, 18 L. R. A. 646, also answer·
the further contentions that a proceeding by injunction in.
such particular is a denial of the right of trial by jury, and,
as the defendant may be punished on a criminal prosecution,
if he also be made subject to an injunction and deprived of
his calling, he is punished twice for the same offense or act.'
Unless prevented by some· constitutional provision, which is.

not claimed, we think the Legislature had the power to change, abolish, or enact rules of equity, and hence are we of the opinion that the court, by reason of the statute, had jurisdiction to proceed as it did.

This brings us to the facts and to the question of whether the defendant practiced medicine within the meaning of the statute. That he had no license or certificate is, **2** on the record, not in dispute. He is what is termed a chiropractor. As defined by Nelson's Ency., chiropractic is:

"A system of therapeutic treatment for various diseases, through the adjusting of articulations of the human body, particularly those of the spine, with the object of relieving pressure or tension upon nerve filaments. The operations are performed with the hands, no drugs being administered."

By the International Ency.:

"A system of manipulations which aims to cure disease by the mechanical restoration of displaced or subluxated bones, especially the vertebrae, to their normal relation. It is claimed that slight displacements of the spinal segments are frequent, that they constrict important nerves and arteries, and that chiropractic adjustment corrects the displacement and relieves the pressure."

The defendant had a common school education, and one year in a high school. From the time he was sixteen to thirty-one years of age he was a machinist working in machine shops. Then he took a one-year's course and graduated in chiropractic at Dr. Palmer's school at Davenport, Iowa, and thereafter, for about four years, and until these proceedings, practiced his profession or calling. The statute (Laws 1911, p. 132) provides:

"The board (medical examiners) shall have power to examine any person of good moral character who furnishes satisfactory proof of having received a degree or diploma from a legally chartered medical college, the requirements whereof shall include the following subjects as required by the board at the present time, namely: Histology, anatomy, physiology, chemistry, toxicology, urinalysis, therapeutics, bacteriology, pathology, theory and practice of medicine, or osteopathy, surgery, obstetrics, materia medica or osteopathic therapeutics, gynecology, pediatrics, dermatology, hygiene, medical jurisprudence, ophthalmology, otology, rhinology, laryngology.

The foregoing showing an aggregate of 3,500 hours and any legally chartered school. having the foregoing requirements shall be deemed a recognized school of medicine. Said applicant shall present a certificate from a high school of the first grade or its equivalent, and shall have furnished evidence of at least two units work in Latin and German, * * * and if upon examination of such person, the board is satisfied with his educational attainments, and that the applicant is qualified to practice medicine and surgery, then the board shall issue a certificate to such person so qualified and examined.''

It is not claimed that Dr. Palmer's school met these requirements or that the defendant had studied or had knowledge of any of these subjects, except anatomy, physiology, toxicology, urinalysis, and obstetrics. And thus is it apparent that he did not possess a degree or diploma of such a college as is required by the statute to entitle him to take an examination. He maintained an office at Ogden, and in the newspapers advertised as a ''Graduate Chiropractor. No drugs, or surgery, or osteopathy. Try chiropractic. Rooms 212-13-14 Col. Hudson Building. Phone 311.'' Just what he did is best shown by the testimony of his patients whom he treated or manipulated, and by his own testimony.

One of them testified:

That he took his little girl to the defendant for treatment. ''I took the girl there to see what was wrong with her, and I asked the doctor what was the cause, and he said it was St. Vitus' dance, and I asked him if he thought he could do any good, and he said he could; he undressed the baby and laid it on a sort of table and pressed on her spine, * * * and said there was some of the spine was out of place, and by putting them back it would cure the case. * * * He said that the spine was out of adjustment, needed replacing, needed resetting, or something, * * * wanted to know if the baby was ever hurt, and I told him she was, and at that time he said as soon as he examined her he could see she had been hurt upon the head.''

Another witness testified:

That he had been sick for several months, and asked the defendant if he could help him. The defendant replied that he

could. "He put me on a table; he pressed my spine three times; he worked on me a minute or two;  *  *  *  he said he would cure me in eight or ten days."

Another testified:

"I consulted him about my condition, and he told me what the matter was, and he told me that he could guarantee me a cure. He said I had a goiter; that he would cure me for $60. He gave me the adjustments, that is what he calls it; all his treatments, he gives the adjustment of the spine, that is, the main part. He has a table, I should judge, about five or six feet long. It has a place for your feet and a headrest, and the other part is just hollow, and you are face downward, and he adjusts the spine or the neck.  *  *  *  He does it with his hands and fingers. I think I went up there three months.  *  *  *  I had a goiter. I had been to medical men and had them treat me. A regular practicing physician told me the best thing was to have it taken out, and then I went to Freenor.  *  *  *  He examined my spine.  *  *  *  He simply placed his hands along the spinal column, and asked me if there was any soreness, and when I told him there was he placed pressure on that part of my spine.  *  *  *  While I was in his office he called my attention to another patient who had epileptic fits, and he said he could cure them.  *  *  *  He showed me how he adjusted him for it. The young man thought he had a goiter, but he [the defendant] said it was no more goiter than anything else, but he didn't have a goiter; that what he had was this other. He just took his hand and ran down his spine, and he told me just exactly where it was and how he did in order to cure this disease."

Another testified:

"I took the baby up there. He examined the baby down the spine and neck. He said it was a weakness of the spine that ailed the baby; there were three disconnections; that the spine wanted to be adjusted. I have been taking her ever since until now, and he is treating her now.  *  *  *  I have paid him eighty dollars.  *  *  *  I saw improvement in the child in about three weeks,  *  *  *  and the child is continuing to improve.  *  *  *  I had taken the child to medical doctors, and they didn't give me any relief.  *  *  *  He told

me what the cause was that ailed the baby. He told me that the injury to the spine was probably caused in childbirth, and I could see there had been injury to it.''

Another witness testified:

''He examined my daughter and told me what ailed her. He said diabetes. He only adjusted her spine. She lay on his table. * * * I think it was the seventh or eighth joint where he adjusted it. He didn't say he could cure my daughter. He has been treating her right along. * * * Two doctors had treated her. She got no relief, and then I went to Freenor in despair. He took and pressed her back, felt the vertebrae as they go along there, and he pressed on a particular vertebra. * * * It showed that the vertebrae was out of alignment at that point, and that appeared to be more tender than the other places. * * * It was about the eighth, I think, from the neck. * * * He put his hand on the spinal column at that place and gave some pressure and adjusted the vertebra. * * * My daughter has improved; * * * she is gaining right along.''

Another testified:

''I had been quite sick, and I tried several things, and couldn't get relief.'' She went to the defendant. ''I think he told me what he thought ailed me. The back had been jarred and kind of grown together. He didn't give it a name. He said my spleen ailed me. It was spleen anaemia. I took some treatments. I don't exactly know how many. * * * He told me that this trouble came from the backbone, from the nerve being pinched. * * * He told me that the vertebrae was out of normal condition. He told me it was subluxed. There was two or three of the vertebrae adjusted. * * * He called my attention that certain nerves coming through the spinal column, through the foramina lead to certain organs of the body, and these particular places where I felt a soreness were places where the nerves came out and ran to the spleen, and at that particular place there was a sort of squeezing of the nerves supplying the control of the spleen.''

Another testified:

''We took our little boy up there. He looked at the boy. I told him he had infant's paralysis, and that he was paralyzed,

and he looked at him, and he told him he might get the boy better. He couldn't tell me sure. He made an examination. * * * The little boy's leg was paralyzed; he couldn't walk. The doctor looked along the backbone, he looked at the leg, and looked at the back. I saw him press on the backbone quickly and gently. The little boy didn't get better, because I quit."

Another testified:

That she was ill; that her hands and feet would get numb just like they were, paralyzed; that she had severe pain in the neck and back of her head for six years. "He didn't tell me what ailed me, only in a way. He said for one thing I was tired and worn out and poor circulation of the blood, and was caused from the spine. He said he might help me; he wasn't certain. * * * He adjusted my spine. * * * He put his hand down my spinal column and found eight different places in my spine that was very bad. * * * He didn't say what the trouble was. He just treated me and kept his mouth shut; he didn't say anything about it. He put his hands on my spine and gave a quick movement. * * * It cured me sound and well from that pain in my head."

Another witness consulted the defendant for pain in the head. He told her—

"there was a vertebra right here between my shoulders that was out of place. * * * He just used his hands and pressed on that vertebra and put it back in place. * * * He said the fourth or fifth * * * was out of place, and that would cause the arteries to be shut off going to this side of the head, the nerves, and that it stopped the circulation of the blood, and by putting that back into place would overcome this. I took my child to the defendant. * * * He showed me a couple of vertebrae that were out of place. I could see they were out of line. He placed the child upon the. table; then put his hand on the child's back along the vertebrae and gave a quick shove or push. * * * It cried and walked in his sleep for six years. The child got over it, and has not been troubled since."

Other witnesses testified to similar treatments for other ailments. All of them testified that the defendant used no drugs, administered no medicine, nor used any instrument or agency

except his hands. All but one or two testified that they paid him for the treatments from $10 to $80. Most of them testified that they were benefited by the treatments.

The defendant was a witness in his own behalf. After defining the system of chiropractic, he testified:

"As a chiropractor, I claim that, if a vertebra is out of proper relation to the others, it impinges or presses upon some nerve, and that that impingement or pressure upon some nerve interferes with the transmission of the vital force to the tissues and organs of the body, and my purpose is merely to remove that pressure, to the end that the normal transmission of life energy may be carried to the organs and tissues of the body. At the point in the spine where I adjust the vertebrae there is no diseased condition nor abnormal or pathological condition in a diseased sense. These parts, though slightly out of place, are nevertheless normal and healthy. There may, however, as a result of the condition I describe in the spine, be disease in some or all parts of the body. The chiropractor has nothing to do with the diseased part. All I do is to adjust the vertebrae to their normal position to take the pressure off the nerve that is hindering a normal flow of life energy and producing a lack of function in those tissues manifesting disease. * * * I do not make any diagnosis of the patient. I do not do anything except what I have already described. The thing I do there I call an adjustment. My hands are locked, and the movement is by straightening the arm as rapidly as possible, like that, for the reason that I attempt to remove that vertebra alone. If I used a heavy forceful pressure, I would move the whole spine, and what I want to do is just to move the one vertebra that is out of position, and I must strike it like you would plain brick, if you wanted to move one of the bricks into alignment, that is all you do in making the adjustment. * * * The school I attended [Palmer School of Chiropractic] does not tell how to treat kinds of diseases; it doesn't try to distinguish between one disease and another, except so far as they want to teach terminology. If a fellow said, 'I have got Bright's disease,' well, you wouldn't know what Bright's disease was, or if he said he had diabetes mellitus, you wouldn't know what that was, or neuralgia, or inflammation; it is to dis-

tinguish the meaning of the terms. They teach how to distinguish between different diseases. In my practice I don't try to distinguish; it is not necessary. If a person came into my office and says, 'I have diabetes,' his word would not count anything any more than mine would if I said he had diabetes. * * * Diabetes insipidis is the name for the disease where there is an abnormal flow of urine without sugar in it. It is not a diseased condition of the kidney. It is an overproduction of the kidney. * * * There is a disease of the kidney. Bright's disease is a disease of the kidney. I don't treat Bright's disease. I can distinguish when a person has Bright's disease. I would have to do that by urinalysis. If a patient comes to me and tells me that he has Bright's disease, I don't investigate to find out whether or not he has. I have had a patient come to me with Bright's disease. I did not make an investigation to find out whether it was Bright's disease. He had been to several prominent doctors here, and they all said he had Bright's disease, and that they couldn't help him, and he came to me, and I just analyzed his spine and located the pressure on the nerves leading to the kidneys that were producing this disease, and after that vertebra was placed back he came to the office and told me that he had gone around to the doctors, and they had told him that he had no Bright's disease; that he was well, and, in fact, passed a life insurance. * * * I took his word for it that he had Bright's disease. I didn't determine if he had any disease of the kidney at all. There are certain nerves that run from the spine to the kidneys between the tenth and eleventh and twelfth dorsal vertebrae, occasionally between the twelfth dorsal and first dorsal lumbar. The spinal cord is in the vertebrae. It runs right down through the center. Certain nerves extend to the lungs. They come from between the first, second, and third, and occasionally between the third and fourth, dorsal. They vary, often finding nerves going to the intestines as high up as between the ninth and tenth dorsal vertebrae and as low down as the fifth lumbar. The heart is usually governed by the nerves running between the first and second and third dorsal vertebrae. Persons that come to see me are usually sick and ailing. I don't treat the sick and ailing; I simply adjust their spine; I make a distinction between adjustment and

treatment.  If a person comes to me and says, 'I am troubled with diarrhea,' I analyze the spine to determine between what two vertebrae the nerve is being pinched at; that is to locate the subluxation that is the cause of the impingement of that particular nerve and make the adjustment there and remove the pressure.  I don't use any knives at all, or mallets. I don't see that I operate upon them with my hands.  That depends upon what people think is operating.  If a person comes in and says, 'I am not feeling well,' I just say, 'Go behind the screen and strip to the waist line; I will analyze your spine.' It is not necessary to ask what is the matter, whether they have headache, or anything. By analyzing the spine I can tell whether there is a pressure exerted on the nerves leading to the various organs.  These organs have many different functions; and to say what function was impinged by the pressure of that nerve would be utterly impossible.  I would know that pressure existed, but whether it caused constipation, whether it caused tuberculosis of the intestines, or whether it caused diarrhea or typhoid, I couldn't tell you that, because I couldn't see, but I would know that the pressure exerted there may produce any one of various affections; the name signifies absolutely nothing; call it 'Sadie Jones' would be just as good.  The nerves leading between the foramina from the spine and go to the intestines also have ramifications extending to the legs, the generative organs, the bladder.  *  *  * If a person came into my office and said that he was ill, and I didn't ask him what ailed him at all, but told him to strip off and go in and get on the operating table, and I looked at his back, and the first, second, and third dorsal of his vertebrae was normal, I would conclude that he didn't have any trouble in his lungs, and then, if I should go along the ninth or tenth vertebrae, and find them abnormal or out of place, I would say that would be the cause of his disease.  The eighth vertebra leads to the stomach, occasionally, very rarely, to the small intestines, and generally to the spleen, so I would say, if the eighth vertebra was out of adjustment, that was the cause of his illness, provided I didn't find any others.  By looking at the backbone I don't diagnose a man's difficulties or disease. *  *  *  Diagnose is trying to name something, give it some

tangible name.  People have to have names, and we have
names for different diseases; that is why we study terminol-
ogy.  Doctors say Bright's disease in order to convey some
meaning to me, and they say tonsilitis in order to convey some
meaning.  Those names have been given to those different dis-
eases arbitrarily.  When a patient comes in and says he is ill,
I look at his vertebrae and see whether there is any subluxa-
tion of that vertebrae.  *  *  *  I examine the spine to find
what is the cause of their ailment, but by looking at the spine
I don't think I diagnose.  I adjusted Mrs. Menssen's spine.  I
never monkeyed with her goiter.  The goiter was an enlarge-
ment of the gland of the throat.  That was caused by the im-
pingement of some nerve that leads to the throat.  I found an
impingement on her back, and I concluded in my own mind
that was the cause of the goiter, and I manipulated that verte-
bra and removed that impingement.  I know what tonsilitis
is.  I look at their backbone, and when a person has tonsilitis
there is an impingement, and I work to relieve that impinge-
ment.  *  *  *  The adjustment tends to remove the cause
what is hindering the body from curing itself.  *  *  *  I
know what is called consumption of the lungs as much as the
books tell us.  I do not treat that; I make an adjustment of
the vertebrae for that.  *  *  *  I try to make the vertebrae
normal, and then let nature do its work.  *  *  *  I adjust
the vertebra of the neck for the eyes to take the pressure off
the nerves.  I start with the assumption that all disease is
caused by some displacement of some vertebra; that is, 95 per
cent. are caused that way, and the others through an accident
or what is called traumatism.  *  *  *  If you come to me
with heart trouble, and I palpate down over the spine with
my fingers, I would immediately locate the vertebra that is
causing pressure on the nerve and prove it to you by putting
pressure on the nerve after it has left the foramen, and show
you there is a tenderness existing there, and in fact on the en-
tire course of that nerve, and it is shutting off the vital ener-
gy.  *  *  *  Bacteria exist, of course, in various forms,
and cause various diseases, as doctors say.  We take hay fever.
This is a germ disease.  It is inflammation of the nasal lining
of the mucous membrane which often causes hay asthma.  A

person may have the inflammation all through the winter time, but the right occasion hasn't happened. He will say to you, 'If I go into the barn, I will have hay fever.' He knows that there is an occasion waiting for him; he knows that he has got it, but the occasion isn't there, so he doesn't have hay fever until he meets that occasion, and he knows it is in the barn. * * * Under medical treatment, typhoid fever has to run its course. * * * The chiropractor would notice where the vital energy was shut off. He would simply take the pressure off that vertebra, and permit the normal amount of vital energy to extend from the brain to the intestines, resist the intruder, and throw him off the job, and you are well. * * * In typhoid there is a serum used which is supposed to be a preventive. * * * There is a well-recognized serum for diphtheria. * * * In case of diphtheria I would assume that that was caused primarily by some difficulty with the nerve leading from the vertebrae, and I would seek to make the vertebrae normal so that the nerve would supply the necessary energy to protect the tissues that are being attacked by these germs. I wouldn't seek to cure the disease, but simply to remove the cause of it. What the doctor does, he seeks to inject into the body a certain serum which consists of forms of life which attack or are supposed to attack these other bacteria which are causing the disease. And wouldn't it take an intelligent bunch of bugs to hunt out that other bunch and fight them. I think removing the cause is the better way.''

Whether the doing of these things is practicing medicine is dependent upon the statute. They, under some statutes, have been held not practicing medicine. *State* v. *Liffring,* 61 Ohio St. 39, 55 N. E. 168, 46 L. R. A. 334, 76 Am. St. Rep. 358; *State* v. *Herring,* 70 N. J. Law 34, 56 Atl. 670, 1 Ann. Cas. 51; *Hayden* v. *State,* 81 Miss. 291, 33 South. 653, 95 Am. St. Rep. 471; *State* v. *Gallagher,* 101 Ark. 593, 143 S. W. 98, 38 L. R. A. (N. S.) 328; *Bennett* v. *Ware,* 4 Ga. App. 293, 61 S. E. 546. These statutes defined the practice of medicine to be the prescribing, directing, or applying "any drug or medicine or other agency, or appliance" for the treatment of disease, etc. The rulings were influenced by the maxim *noscitur a sociis,* in obedience to which the words "agency" and "appliance"

were held limited by the associated words "drugs" and "medicine." Our statute is dissimilar. Under it one is practicing medicine who for a fee, or other consideration, shall *diagnose* any physical or mental ailment, or any abnormal or physical condition of another, or who shall *treat* any physical or mental ailment, or any abnormal or physical condition of another, or who shall *operate* upon any physical or mental ailment, or abnormal or mental, or physical condition of another, or who shall *prescribe* or *advise* for any physical or mental ailment, or any abnormal mental or physical condition of another, or who shall hold himself out as a physician or surgeon. In the case of *State* v. *Yee Foo Lun,* 45 Utah, 531, 147 Pac. 488, we said:

"If any one does that without a license, he offends, no matter what remedy, substance, or thing he may prescribe, give, administer, or advise. * * * He offends though he may give or administer but castor oil, or Hostetter's bitters, or a boiled concoction of bark, roots, or herbs, or may give nothing, and only advise exercise or rest."

The statute is not restricted to prescribing, giving, administering, or applying drugs, medicine, or other agency or remedy. It is broad and unrestricted, and by its language was intended to be so. The court in *State* v. *Edmunds,* 127 Iowa 333, 101 N. W. 431, said:

"Undoubtedly the state has the right to determine what acts shall constitute the practicing of the healing art, and it may impose conditions on the exercise of that privilege. * * * Having defined the terms it uses, courts should accept the definition given, and not be too subtle in the use of refined distinctions. To save its people from quacks and charlatans, the state has plenary power to prohibit [prescribe] or supervise the exercise of the healing art."

Our statute is similar to the Illinois statute. There it was held that one practicing osteopathy was practicing medicine within the meaning of that statute declaring that "any person shall be regarded as practicing medicine who shall treat, operate on, or prescribe for, any physical ailment of another." *Jones* v. *People,* 84 Ill. App. 453. Similar rulings were made under statutes not as broad as ours (*Bragg* v. *State,* 134 Ala. 165, 32 South. 767, 58 L. R. A. 925; *Little* v. *State,* 60 Neb. 749, 84 N. W. 248, 51 L. R. A. 717; *State* v. *Gravett,* 65 Ohio

St. 289, 62 N. E. 325, 55 L. R. A. 791, 87 Am. St. Rept. 605),
likewise that chiropractic is practicing medicine (*State* v.
*Johnson,* 84 Kan. 411, 114 Pac. 390, 41 L. R. A. [N. S.] 539;
*State* v. *Miller,* 146 Iowa 521, 124 N. W. 167; *State* v. *Smith,*
233 Mo. 242, 135 S. W. 465, 33 L. R. A. [N. S.] 179); so a
magnetic healer who treated a lame ankle by rubbing the af-
fected parts (*Parks* v. *State,* 159 Ind. 211, 64 N. E. 862, 59 L.
R. A. 190; *People* v. *Gordon,* 194 Ill. 560, 62 N. E. 858, 88 Am.
St. Rep. 165; *Smith* v. *People,* 51 Colo. 270, 117 Pac. 612, 36
L. R. A. [N. S.] 158), and one who professed to cure disease
by suggestive therapeutics and laying on of hands (*Witty* v.
*State,* 173 Ind. 404, 90 N. E. 627, 25 L. R. A. [N. S.] 1297).
And it may be stated that, under statutes similar to ours, it
has been quite generally held that what the defendant did was
practicing medicine within the meaning of the statute.   Per-
haps an exception to this is the case of *Nelson* v. *Board of
Health,* 108 Ky. 769, 57 S. W. 501, 50 L. R. A. 383. Under the
evidence we think it indisputably shown that the defendant
diagnosed, treated, and operated upon physical ailments and
abnormal and physical conditions of others for a fee, and that
he held himself out to treat such ailments and conditions. True,
he testified that he made no diagnosis; but he cannot excul-
pate himself by his own definition of that term, "trying to
name something; give it some tangible name"—a definition
which has neither judicial nor scientific sanction.   It is at
war with definitions of lexicographers: Webster and Standard,
"The art or act of recognizing the presence of disease from its
signs or symptoms and deciding as to its character;" Inter-
national Ency., "The determination of the nature of a disease
as well as of a condition of the organ or tissues affected"—and
manifestly is not the sense in which the term is used in the
statute, nor in which it is either popularly or technically un-
derstood.   The defendant's statements that he did not "diag-
nose any disease" or "the patient," that "he had nothing to
do with the diseased part," and that all he did was "to look
at the spine and vertebrae—analyze the spine—to ascertain
whether there was any displacement or subluxation or any oth-
er abnormal condition of the vertebrae," and "whether there
was pressure or an impingement of the nerves, or an interfer-

ence with vital energy or force, or a hindrance of the normal flow of life energy producing the disease," and "to examine the spine to find what is the cause of their ailment," are mere evasions and confusions of what, in fact, is diagnosis to ascertain the cause of the disease or ailment. So are his statements, "I don't treat the sick or ailing; I merely adjust their spine; I make a distinction between adjustment and treatment;" that he "did not treat goiter but merely manipulated the vertebrae to remove the impingement which caused it;" nor consumption, but merely "made an adjustment of the vertebrae for that"; nor the eye, simply "adjusted the vertebrae of the neck for that"; nor tonsilitis, or diphtheria, "merely made the vertebrae normal so that the nerve would supply the necessary energy to protect the tissues that are being attacked by these germs." Doing these things the defendant does not call "treating a disease or ailment," merely "an adjustment to remove the cause of the ailment," and thus again, by his own and unwarranted definition, seeks to exculpate himself. As well say that a regular physician did not treat an ailment by giving or advising something to remove the cause producing the ailment. To ascertain and remove the cause of an ailment is one of the essentials sought by every efficacious system of treatment. It is difficult to understand how removing or attempting to remove, the cause of an ailment is not treating, or attempting to treat the ailment itself. Whatever merits or demerits the system of chiropractic may have, it is but egotism to assert that it is the only system which seeks to ascertain and remove causes of disease or ailments, and on that ground to claim it distinguishable from all other systems of treatment.

The law is not concerned with the question of whether chiropractic is as good as or better than other systems of treatment. It is concerned with the question that before any one shall undertake, no matter by what system, to diagnose, treat, operate upon, or prescribe or advise for any physical or mental ailment or condition of another for a fee or other consideration, he shall possess the learning and skill required by the statute and produce a degree or diploma from a college meeting the requirements enumerated in the statute, and successfully pass an examination before the board showing his competency.

When he does that, then he can practice whatever system he may consider the most efficacious, or do that in a given case which he thinks will produce the best result. Until he does that he cannot practice at all, unless he comes within the exception of the statute, "those who heal only by spiritual means without pretending to have any knowledge of the science of medicine," an exception put in the statute to permit treatment by Christian Science or other spiritual means.

When we look to the testimony of the defendant's patients, it very clearly appears that he not only diagnosed physical ailments and abnormal conditions, but also treated them. One of them he diagnosed as "St. Vitus' dance;" another "a goiter;" another "spleen anaemia;" another "diabetes;" another as "a worn-out condition" and "lack of blood circulation;" and all of them as displaced or subluxed vertebrae, some at six or eight places. These he manipulated and adjusted to remove the cause producing the ailments which he said the patients had. That such is diagnosing and treating an ailment or condition of another cannot successfully be gainsaid. As stated by the Illinois court (*Jones* v. *People*, *supra*), if that "is not a treatment or operation for a physical ailment, what is it? It seems to us the mere statement of the question demonstrates the absurdity of every opposite position."

But it is said that, if such a system as practiced by the defendant did no good, it did no harm, and that it is unlike administering powerful drugs or performing surgical operations from which ill consequences may follow unless in the hands of the skillful. Though the defendant's treatments may be harmless, still that is no reason to permit him to violate the law. The statute does not say that one may operate upon or treat an ailment of another so long as he does him no harm or shall not make him worse. But this oft-repeated statement does not bear scrutiny. Much harm may come to one afflicted with an ailment and seeking professional advice or aid from one incompetent to give it. There are many ailments in their acute stages which, if correctly diagnosed and properly treated, yield most readily, but, if not recognized, and not properly treated, become, in their chronic stages, most stub-

born and unyielding. The defendant undertook to treat various aliments of children without even professing any knowledge whatever of pediatrics, and many other ailments where knowledge of histology, biology, pathology, and other branches of science was essential to properly recognize and understand them. It needs no argument to show the harm that may result by one without knowledge of ophthalmology attempting to treat some acute and virulent disease of the eye by attributing the cause of the disease to a subluxed vertebrae of the neck causing "nerve pressure," not that the manipulation to reduce the pretended subluxation might itself do harm, but that in the meantime the disease, for want of recognition and proper attention, may have progressed to a stage where it no longer can be arrested.

We think the findings are well supported by the evidence, and that the judgment is right.

**It therefore is affirmed, with costs.**

McCARTY, J., concurs.


FRICK, J.

I fully concur in all that is said by the Chief Justice. In view of the importance of the questions involved, however, it may not be out of place for me to make a few observations.

It is seldom that the wisdom, utility, and the necessity of a statute can be so forcibly and irrefutably demonstrated in an opinion as is the case in the preceding opinion. Here is a so-called doctor who, without hesitation, informs us in the first quarter of the twentieth century, that:

"In case of diphtheria I would assume that that was caused primarily by some defect with the nerve leading from the vertebrae."

Instead of arresting the deadly toxins, the doctor would merely "palpate" the spine, and in that way attempt a cure.

The same would be true, he informs us, in case of typhoid, tuberculosis, malaria, or any other like disease, all of which, it has been demonstrated over and over again, are caused by some form of bacilli or bacteria. The experiments and experience of the past forty years, all of which have become pub-

licly known and may be found in the health statistics of both the state and the nation, are thus cast to the winds, and we are informed by the doctor that ninety-five per cent. of all human ailments are caused by mere displacements of the vertebrae. Indeed, the doctor contends that in case one suffers from eye-strain, or some other eye difficulty, that in all probability is caused by astigmatism or some other local defect in the eye, he would seek and find both the cause and the cure by making what he is pleased to call an analysis of the vertebrae. While the statute in question does not concern itself with any school of medicine or system of healing, or treating those afflicted with disease, and while it does neither condemn nor approve any particular school or system, yet it does in no uncertain terms require those who desire to follow any school of medicine or system of healing and treating the sick to properly prepare and qualify themselves for that most important duty. If an applicant is qualified under the statute, he is entitled to a license to practice medicine in this state. The law assumes, and it may well do so, that if one possesses the theoretical knowledge required by the statute, he will protect the best interests of society. Under such circumstances it may well be assumed that the one who is so qualified will recognize and appreciate the difference between eyestrain and typhoid, between diphtheria and a sprained joint, between communicable and noncommunicable diseases. The state has the right, and it is its duty, to protect the public against all contagious, infectious, and communicable diseases. While any adult person may perhaps choose his own doctor and method or system of treatment, he has no right, however, in case he is afflicted with a communicable disease, to expose any other person to such disease. This is so whether the afflicted person or his doctor, or both, believe in the modern theory of disease or not. They must submit to the law. If such were not the case, the aim and efforts of state and local health boards to minimize, and if possible, to stamp out, communicable diseases, would be nullified. Each case of contagious or infectious disease, in the hands of a man like the defendant, would become a center of infection and the source of innumerable other like cases. The aim of the bodies aforesaid, with the help of the law, is to

make it possible for all who are born to more nearly live out their natural expectancy of life. Not only is society as a whole vitally interested in bringing about that result, but the individual is likewise interested. That is so not only on account of the economic value of a human life, but is so for many other reasons. It is often the case that those who are without means are very much opposed to statutes like the one in question, and assume that they are inimical to their best interests. The very opposite is the fact. As matter of course, each laboring man with a family is vitally interested in maintaining his own as well as his family's good health. He therefore is directly interested in the enforcement of every law which prevents the communication and spread of disease. Again, the poor man without property, in order to protect his family against want in case of sickness or premature death, must carry some life, and at times other, insurance. We all know that the rates of life insurance are based upon the insured's expectancy of life. Now, if any considerable number of those who are insured will become afflicted with, and prematurely die from, communicable diseases, then the rates of those in the same class who survive must be very materially increased. Vital statistics show that a very large per cent. of the deaths in middle life are caused by preventable diseases. The survivors must thus pay more than their natural share of the burden of insurance. Again, a child, or one in early manhood, may be afflicted with a communicable disease which, while it may not prove fatal, may nevertheless lower the vitality of such an individual and leave him a weakling totally unprepared to withstand the ravages of disease. All such are thus made a burden, not only to themselves, but to those upon whom they are dependent. It is of the utmost importance to all, therefore, that all communicable diseases be limited to as few individuals as it is possible to do. The state, so far as possible, should prevent those who do not possess the requisite qualifications to recognize and combat at least all communicable diseases from following the important calling of healing the sick.

The fact that no specific has as yet been discovered for all communicable diseases is no reason why those who desire to

treat disease should not qualify under the statute.  Nor does the fact in any way do away with the demonstrated facts that nearly all, if not all, of the communicable diseases are caused by the different baccilli or bacteria, and in many instances are communicated by means of insects like the mosquito or house fly, or otherwise.  The potent fact remains that in the last twenty-five years the frightful death rate of children from diphtheria and of adults from malaria, typhoid, yellow fever, etc., has been greatly reduced.  The defendant should know, as all other men know, that the vertebrae of a certain individual may be in precisely the same condition in Mississippi that they are in California after leaving the former state, and yet in the former state he may have been seriously afflicted with malaria, while in the latter he is entirely immune therefrom.  What is true of those diseases is true of many others.  Why then insist that the cause of ninety-five per cent. of all diseases is found in the displacement of vertebrae?  It is a well-known fact that every system of healing sometimes, and under certain circumstances, will produce unlooked-for results, while all systems sometimes, and under certain circumstances and conditions, fail to accomplish what is expected.  It therefore, to a certain extent, may always remain true, as was so well said more than 3,000 years ago:

"Like leaves on trees the race of man is found,
Now green in youth, now withering on the ground;
Another race the following spring supplies;
They fall successive, and successive rise."

Vital statistics have, however, become publicly known whereby it is shown that the causes of disease are becoming more and more understood, and that the public health and welfare are being safeguarded best by those men who are best qualified to discover and recognize the different forms of organisms which cause diseases in the human body.  If the present statute, in connection with proper quarantine regulations, is properly enforced, society will at least be protected against the spread of communicable diseases; and, if that is accomplished, the question of whether one or the other system of healing is applied in individual cases is merely of secondary importance.  One fact must, however, be conceded by all fair-

minded men of every school of medicine, that the man who is so blind as not to discover danger to the human family, except from what he is pleased to call dislocated vertebrae, had better become enlightened by complying with the requirements of the statute, and, after doing so he, no doubt, will discover what others have discovered, that in practicing medicine and in attempting to protect the human family from disease "a little learning is a dangerous thing."