BRUER v. WOODWORTH, Collector of Internal Revenue.

District Court, E. D. Michigan, S. D. September 26, 1927.

No. 8494.

1. Poisons ⬪2—Collector may not arbitrarily refuse permit to physician to dispense narcotic drugs (Harrison Narcotic Act, § 1 [26 USCA § 211]).

Harrison Narcotic Act being a revenue and not a police measure, a collector may not, under § 1, as amended (26 USCA § 211 [Comp. St. § 6287g]), arbitrarily refuse to issue a permit to an applicant qualified under the statute.

2. Courts ⬪265—Federal court may grant mandamus to compel officer to perform legal duty under revenue law.

A federal court has jurisdiction to issue writ of mandamus to compel an officer of the United States to perform a legal duty under a revenue law.

3. Poisons ⬪2—Qualification of physicians to obtain permit under Narcotic Act must be determined under law of state (Harrison Narcotic Act, § 1 [26 USCA § 211]).

Who are "physicians * * * and other practitioners lawfully entitled to distribute, dispense, give away, or administer" narcotic drugs to patients, to whom a permit may be issued under Harrison Narcotic Act, § 1, as amended (26 USCA § 211 [Comp. St. § 6287g]), must be determined by the law of the state where applicant resides.

4. Poisons ⬪2—Osteopathic physician held entitled to register and receive permit under Narcotic Act (Harrison Narcotic Act, § 1 [26 USCA § 211]).

An osteopath, licensed to practice under the law of Michigan (Pub. Acts 1923, No. 92), held entitled to register and receive permit to dispense narcotic drugs under Harrison Narcotic Act, § 1, as amended (26 USCA § 211 [Comp. St. § 6287g]).

Mandamus. Petition on relation of Walter P. Bruer against Fred L. Woodworth, Collector of Internal Revenue, for writ of mandamus. Writ granted.

MacKay, Wiley, Streeter, Smith & Tucker, of Detroit, Mich., for relator.

William W. Potter, Atty. Gen., Chas. B. W. Aldrich, Asst. U. S. Atty., of Detroit, Mich., and Harry A. Metcalf, Asst. Atty. Gen., for respondent.

DAWKINS, District Judge. Plaintiff, a duly licensed osteopathic physician under the laws of Michigan, on June 30, 1927, applied to the collector of internal revenue of the United States for this district for registration and a permit to dispense narcotic drugs, offering to pay the federal tax therefor. The collector declined to receive the money, or to

allow the registration and to issue the permit, upon the ground that the Attorney General for the state of Michigan had ruled that a practitioner of osteopathy is not a physician within the meaning of Act No. 92 of the Public Acts of 1923 (state narcotic law), entitling him to prescribe drugs and narcotics. Thereupon relator filed this suit for a writ of mandamus to compel the collector to comply with his demand.

Respondent answered, admitting substantially all of the allegations of fact, but denying that the petitioner was a physician within the meaning of said statute, or was entitled to register and dispense narcotics or other drugs under the law. At the same time a motion to dismiss was filed, in which it was alleged, first, that this court is without jurisdiction in any "original action for mandamus"; and, second, for the reason that paragraph 4, § 1, of the Harrison Narcotic Law, as amended (26 USCA § 211 [Comp. St. § 6287g]), permits the registration only of such practitioners as are lawfully entitled to dispense such drug, which is a question "for determination in the state courts for the state of Michigan."

## On Motion to Dismiss.

[1, 2] The constitutionality of the statute commonly known as the Harrison Narcotic Law has been upheld by the Supreme Court of the United States solely upon the ground that it is a revenue measure, and that the restrictions placed upon the distribution of such drugs therein were reasonably calculated to insure the collection of the tax. The Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, is given power to make all necessary rules and regulations for the carrying of the act into effect. However, I take it that this does not and could not give to the Commissioner, or any one else, the power to do what Congress itself could not do, and that is to police the traffic in narcotics upon purely moral or arbitrary grounds. It would hardly be contended that the national lawmaking body could absolutely prohibit the traffic.

Hence it seems to me that, when an applicant for registration has met all the reasonable requirements of the law intended to insure collection of the tax, to say that the Commissioner, or his agent, the collector, can arbitrarily refuse that right, is to hold that the instrumentality for administering the statute is more powerful than its creator (Congress), and, if a citizen is without remedy in such circumstances, the government becomes one by men, and not of laws. In my opinion, no such condition exists or was intended. Being a matter concerning the revenue, I think this court undoubtedly has jurisdiction, even though the sole relief is an original writ of mandamus, to compel performance of a legal duty.

[3] The issue is one of law, and, Congress having given no definition of what is meant in section 1 of the Harrison Act by the phrase "physicians * * * and other practitioners lawfully entitled to distribute, dispense, give away, or administer any of the aforesaid drugs to patients upon whom they in the course of their professional practice are in attendance, * * * *" we must look to the state law where the applicant resides to determine who may distribute the drug. Besides, I hardly think that it (Congress) would have the power to say who is or is not a physician; for this, it seems, would be to enter the realm of police regulation reserved to the states.

[4] The Anti-Narcotic Law of the state of Michigan, Act No. 92 of the Public Acts for the year 1923, bears the title: "An act to regulate the sale, disposition, distribution and possession of certain habit forming drugs, to provide a procedure for the discovery of evidence of the violation of this act and to provide for penalties for the violation hereof."

By section 1 it is made unlawful for any one to sell, distribute, or dispense, or to have in his possession, any of the said drugs, except as provided in that act, and sections 4 and 7 read as follows:

"Sec. 4. Any person holding an unexpired certificate as a registered pharmacist or registered druggist under the laws of this state may dispense any drug or drugs mentioned in Section 1 of this Act upon a written prescription or order of a physician, veterinarian or dentist duly qualified to practice under the laws of this state, which prescription shall be retained in the pharmacy or store in which the same was dispensed, by the proprietor thereof or his successor for a period of two years. Said prescription shall be filled but once and no copy of it shall be taken by or furnished to any person, except the same be required for the enforcement of this act."

"Sec. 7. Nothing in this act contained shall be construed to forbid or regulate the dispensing or distribution of any of the drugs mentioned in section one of this act by or under the instructions of a lawfully practicing physician, dentist or veterinarian in the course of his professional practice, and not

for the purpose of evading the provisions of this act."

It appears, therefore, that a physician is permitted under the law of Michigan to prescribe and dispense narcotics, and the crucial question is as to whether a practitioner of osteopathy is a physician, within the fair meaning of this statute.

Section 2 of Act 162 of the Public Acts of 1903 (Michigan), as amended (Pub. Acts 1913, No. 305), regulating the practice of osteopathy in this state, read as follows:

"Any person before engaging in the practice of osteopathy in this state, shall upon the payment of a fee of twenty-five dollars, make application for a certificate to practice osteopathy to the board of osteopathic registration and examination, on a form prescribed by the board, giving first his name, age (which shall not be less than twenty-one years) and residence; second, evidence that such applicant shall have, previous to the beginning of his course in osteopathy, a diploma from a high school, academy, college or university, approved by aforesaid board or in lieu thereof, its equivalent credentials to be approved by the board; third, the name of the school or college of osteopathy from which he was graduated, and which shall have been in good repute as such at the time of the issuing of his diploma, as determined by the board; fourth, the date of his diploma, and evidence that such diploma was granted on personal attendance and completion of a course of study of not less than four years of eight months each, and such other information as the board may require: Provided, that the said provisions applying to the course of study changing said course of study from three years of nine months each to four years of eight months each shall not take effect until February 1, nineteen hundred sixteen. The board may in its discretion accept as the equivalent of any part or all of the second and third requirements, evidence of five or more years' reputable practice of osteopathy, by an osteopathic physician located in the state at the time of the passage of this act: Provided, that such substitution be specified in the certificate. If the facts thus set forth, and to which the applicant shall be required to make affidavit, shall meet the requirements of the board, as laid down in its rules, then the board shall require the applicant to submit to an examination as to his qualifications for the practice of osteopathy, which shall include the subjects of anatomy, physiology, chemistry, toxicology, pathology, bacteriology, histology, neurology, diagnosis, obstetrics, gynecology, surgery, hygiene, public health laws of Michigan, medical jurisprudence, principles and practices of osteopathy and such other subjects as the board may require. If such examination be passed in a manner satisfactory to the board, then the board shall issue its certificate granting him the right to practice osteopathy in the state of Michigan, in all its branches as taught and practiced in the recognized colleges and schools of osteopathy. Any person failing to pass such examination may be re-examined at any regular meeting of the board within a year from the time of such failure without additional fee: Provided further, that the board may, in its discretion, dispense with an examination of the case, first, of an osteopathic physician duly authorized to practice osteopathy in any other state or territory, or the District of Columbia, who presents a certificate or license issued after an examination by the legally constituted board of such state, territory or District of Columbia, accorded only to applicants of equal grade with those required in Michigan; or, second, an osteopathic physician who has been in legal practice of osteopathy for five years, who is a graduate of a reputable school of osteopathy, who may desire to change his residence to Michigan, and who makes application on a form to be prescribed by the board, accompanied by a fee of twenty-five dollars. The board of osteopathic registration and examination shall refuse to issue a certificate of registration provided for in this section to any person guilty of grossly unprofessional and dishonest conduct."

Section 4 is also as follows:

"The certificate provided for in section two of this act shall entitle the holder thereof to practice osteopathy in the state of Michigan in all of its branches as taught and practiced by the recognized colleges or schools of osteopathy, but it shall not authorize him to practice medicine within the meaning of act number two hundred thirty-seven of the Public Acts of eighteen hundred ninety-nine, or acts amendatory thereto: Provided, that nothing in this act shall be construed as to prohibit any legalized osteopathic physician in this state from practicing medicine and surgery after having passed a satisfactory examination before the state board of medical examiners in the state of Michigan. Osteopathic physicians shall observe and be subject to the state and municipal regulations relating to the control of contagious diseases, the reporting and certifying of births and

deaths, and shall have the right to certify to births and deaths."

The collector takes the position that he will grant or withhold a permit to physicians and particularly to osteopathic practitioners, according to whether or not the highest legal adviser of the state (the Attorney General) finds that they are permitted to dispense narcotics under the state law. There has been no ruling upon the question, in so far as osteopaths are concerned, by the court of last resort of the state of Michigan, but the predecessor of the present Attorney General held that the law did permit them to dispense such drugs and accordingly this applicant was granted a permit by the collector for the year 1926–27, and was only refused renewal for the current year because of the ruling of the present Attorney General.

It is proved by the applicant, and no contradictory evidence offered by the respondent, that all recognized schools of osteopathy teach anatomy, physiology, chemistry, toxicology, pathology, bacteriology, histology, neurology, diagnosis, obstetrics, gynecology, surgery, hygiene, etc., and that they have well-organized hospitals and clinics where nearly all of human ills are diagnosed and treated, although they give no internal medicine; that it is a part of their regular practice to handle obstetrical cases and others involving intense pain and suffering, where it is essential to afford temporary relief by the use of anæsthetics. Besides, the provisions of the law above quoted affecting osteopathy in several places refer to them as "osteopathic physicians." It is true that section 6732 of the Compiled Laws of the State of Michigan of 1915 (Medical Practice Act) defines the practice of medicine in the state as follows:

"The term 'practice of medicine' shall mean the actual diagnosing, curing or relieving in any degree, or professing or attempting to diagnose, treat, cure, or relieve any human disease, ailment, defect, or complaint, whether of physical or mental origin, by attendance or by advice, or by prescribing or furnishing any drug, medicine, appliance, manipulation or method, or by any therapeutic agent whatsoever."

Yet, if this section were literally construed in its application to osteopaths, it would prevent them from "diagnosing, curing or relieving, * * * or professing or attempting to diagnose, treat, cure or relieve any human disease, ailment, defect, or complaint, whether of physical or mental origin, by attendance or by advice, or * * * appliance, manipulation or method." This would make it impossible for them to pursue their profession.

I think the reasonable, sensible view to take is that the Legislature intended to prevent the practice of medicine, surgery, osteopathy, etc., except by those who were qualified to do so, according to well-recognized methods used by their respective schools of practice, and that it did not purport to draw any fine and narrow distinction between them such as would prevent the use of any usual and recognized agency for the accomplishment of their respective ends. Modern thought abhors the idea that a prospective mother shall be denied the alleviation to be had from the use of some kind of narcotic in childbirth, and if an osteopathic physician is permitted to attend and render his professional services on such occasions, both by law and the recognized limits of his profession, it appears to me unreasonable to say that he should be denied the use of those agencies which would permit him to do so according to modern and humane standards. In my opinion, nothing short of positive prohibition would suffice to sustain that contention.

My conclusion is that the relator is entitled to relief, and that a writ of mandamus should issue to respondent, directing him to register and grant to petitioner a permit authorizing him to dispense narcotics in the practice of his profession according to law, as interpreted herein. Waldo v. Poe (D. C.) 14 F.(2d) 749; Bandel v. Department of Health of the City of New York, 193 N. Y. 133, 85 N. E. 1067, 21 L. R. A. (N. S.) 49. See, also, People v. Phippin, 70 Mich. 6, 37 N. W. 888; Locke v. Judge, 184 Mich. 535, 151 N. W. 623; Howerton v. District of Columbia, 289 F. 628, 53 App. D. C. 230; People ex rel. Gage v. Siman, 278 Ill. 256, 115 N. E. 817; State v. Schmidt, 138 Wis. 53, 119 N. W. 647; Towers v. Gilder & Levin, 101 Conn. 169, 125 A. 366, 40 A. L. R. 1263.

A decree in accordance with these views may be presented.