**GEORGIA ASS'N OF OSTEOPATHIC PHYSICIANS AND SURGEONS, Inc., et al. v. ALLEN, Collector of Internal Revenue.**

No. 56.

District Court, M. D. Georgia, Macon Division.

Feb. 2, 1940.

Carl N. Davie, of Atlanta, Ga., for plaintiffs.

T. Hoyt Davis, U. S. Atty., and H. Grady Rawls, Asst. U. S. Atty., both of Macon, Ga., for defendant.

DEAVER, District Judge.

The question in this case is whether an osteopath in this state is entitled to register with the Collector of Internal Revenue under the Harrison Narcotic Act, 26 U.S.C.A. §§ 1040–1054, 1383–1391. That act requires registration by "Physicians, dentists, veterinary surgeons, and other practitioners, lawfully entitled to distribute, dispense, give away, or administer" narcotic drugs. 26 U.S.C.A. §§ 1383, 1384. The right of an osteopath to register de-

pends upon whether under the state law he is entitled to distribute, dispense, give away or administer narcotics. If he is so entitled, the Collector has no discretion to refuse registration. Perry v. Larson, 5 Cir., 104 F.2d 728; Bruer v. Woodworth, D.C., 22 F.2d 577; Starnes v. Rose, D.C., 282 F. 336.

The state narcotic act, Ga.Laws 1935, p. 418, is codified in the Georgia Code, Chapter 42-8. Section 42-806 authorizes the sale of narcotic drugs to a physician and Section 42-808 authorizes a physician to dispense narcotic drugs. As defined in Section 42-802(2), the word "'physician' means a person authorized by law to practice medicine in this State and any other person authorized by law to treat sick and injured human beings in this State and to use narcotic drugs in connection with such treatment".

The law regulating medical practitioners is contained in Code 84-9. Section 84-901 reads as follows: "The terms 'practice of medicine,' 'to practice medicine,' 'practicing medicine,' and 'practice medicine,' as used in this Chapter, are hereby defined to mean holding one's self out to the public as being engaged in the diagnosis or treatment of disease, defects or injuries of human beings, or the suggestion, recommendation or prescribing of any form of treatment for the intended palliation, relief or cure of any physical, mental or functional ailment or defect of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift or compensation whatsoever, or the maintenance of an office for the reception, examination and treatment of persons suffering from disease, defect or injury of body or mind, or attaching the title 'M. D.,' 'Oph.,' 'D.,' 'Dop.,' 'Surgeon,' 'Doctor,' either alone or in connection with other words, or any other words or abbreviations to his name, indicating that such person is engaged in the treatment or diagnosis of disease, defects or injuries of human beings."

Sections 84-906 and 84-907 make it unlawful to practice medicine without a license from the State Board of Medical Examiners, with the provision that nothing in this chapter shall apply to "osteopaths not prescribing medicines or administering drugs."

The law regulating osteopaths is codified in Code Chapter 84-12. It creates a Board of Osteopathic Examiners. An applicant for a license to practice osteopathy must hold a diploma from some legally incorporated and reputable school of osteopathy requiring a course of study of at least three terms of nine months each. The Board is required to examine the applicant in anatomy, physiology, chemistry, toxicology, pathology, diagnosis, hygiene, obstetrics, gynecology, surgery, medical jurisprudence, principles of osteopathy and such other subjects as the Board may require. The license authorizes "the holder to practice osteopathy as taught and practiced in the legally incorporated and reputable colleges of osteopathy as provided for in this chapter." Code, § 84-1209. That chapter contains also the following: "Osteopathic physicians shall observe and be subject to all State and municipal regulations relating to the control of contagious diseases, the reporting and certifying of births and deaths, and all matters pertaining to public health, the same as physicians of other schools, and such reports shall be accepted by the officers or department to whom the same are made." Code, § 84-1211.

Code, § 84-9919, provides that: "Any person who shall practice, or pretend to practice, or use the science of osteopathy, or other nondrug-giving school of medical practice, in treating diseases of the human body, by fraud or misrepresentation, shall be guilty of a misdemeanor."

Code, § 84-9918, applies to any one holding himself out as practicing osteopathy or "any other nondrug-giving school of medical practice".

Under the state narcotic act a "physician" is authorized to buy and dispense drugs and is, therefore, entitled to register under the federal narcotic act. The contention of plaintiffs is that under Code, § 42-802(2), an osteopath is a physician.

1. Plaintiffs say first that an osteopath is a physician because he is a person authorized to treat sick and injured human beings and to use narcotics in the treatment. That authority, they say, is granted by the Act of 1909, because the use of narcotics was taught and practiced at that time in the colleges of osteopathy.

In 1908, the Code definition of "practice medicine" was as follows: "The words 'practice medicine' shall mean, to suggest, recommend, prescribe or direct, for the use of any person, any drug, medicine, appliance, apparatus, or other agency, whether material or not material, for the cure, relief, or palliation of any ailment

or disease of the mind or body, or for the cure or relief of any wound, fracture, or other bodily injury or any deformity, after having received or with the intent of receiving therefor, either directly or indirectly, any bonus, gift or compensation." Civ.Code Ga.1910, § 1683.

In Bennett v. Ware, 4 Ga.App. 293, 61 S.E. 546, 548, the court construed the above-quoted language to mean "That the practice of medicine, defined by the Code, supra, is limited to prescribing or administering some drug or medicinal substance, or to those means and methods of treatment for prevention of disease taught in medical colleges and practiced by medical practitioners." By way of argument the court discussed osteopathy as a practice without drugs, and said: "We believe that the better rule and one more in consonance with reason and in harmony with the republican character of our institutions is that all statutes for the regulation of the practice of medicine can be sustained only on the ground that they are necessary to protect the public against quack medical practitioners and impostors who prescribe drugs and medicines in treating diseases, and that these statutes are not directed against or intended to include those who eschew the practice of medicine altogether, but advance some new theory, such as osteopathy, for the alleviation of pain and the curing of the sick."

On page 302 of 4 Ga.App., 61 S.E. at page 546, the court, by quoting the Mississippi Supreme Court, suggested that a wise Legislature would doubtless in the future make suitable regulation for the practice of osteopathy. The very next year, 1909, the Georgia Legislature did authorize the practice of osteopathy by enacting the law on that subject now contained in the Code. The Legislature, being no doubt acquainted with that decision, classified osteopathy as a nondrug-giving school of medical practice. See Code, §§ 84-9918, 84-9919.

The Legislature, therefore, probably did not intend in the Act of 1909 to authorize the use of narcotic drugs. However, even if that act did so authorize, the Legislature in 1913 (Code, § 84-906) prohibited such use by osteopaths. No other statute, prior to the narcotic act of 1935, authorizes osteopaths to use drugs. Therefore, an osteopath is not a "person authorized * * * to treat sick and injured human beings in this State and to use narcotic drugs in connection with such treatment", and if an osteopath is a physician under 42-802(2), it is because he is authorized "to practice medicine".

2. Is an osteopath authorized to practice medicine?

While the Act of 1909 authorizing the practice of osteopathy was in force, the Legislature in 1913 enacted a new definition of practicing medicine now contained in Code, § 84-901, above quoted. In 1908 the Court of Appeals in the Bennett case, supra, construed the then existing definition of practicing medicine so as not to include osteopathy and the next year the Legislature in the light of that decision classified osteopathy as a nondrug-giving practice and, therefore, must have regarded it as not covered by that definition. So, prior to 1913 an osteopath was not authorized to practice medicine and if any change has been made it was effected by the Act of 1913, Code 84-901. If that section does not enlarge the definition of practicing medicine so as to include osteopathy, then an osteopath is not engaged in practicing medicine and is, therefore, not a physician under 42-802(2). If the definition is so enlarged and an osteopath under the new definition is engaged in practicing medicine, then the question would remain whether the words "to practice medicine" in 84-901 have the same meaning as "to practice medicine" in 42-802(2).

The above-quoted words in those two sections must be construed.

The language in 84-901, if given its customary and natural meaning, could hardly be made broader. In Collins v. State of Texas, 223 U.S. 288, 32 S.Ct. 286, 56 L.Ed. 439, the court construing a similar broad definition held that an osteopath was engaged in the practice of medicine. The same was held as to a chiropractor in Steinbach v. Metzger, 3 Cir., 63 F.2d 74. One view is that in passing the Act of 1913 (Code, § 84-901), it was the intention of the Legislature to broaden the definition of "practicing medicine" and to make it sufficiently comprehensive to include all persons engaged in what is commonly referred to as the healing art and by that same act to require all persons so engaged to have a license from the Board of Medical Examiners unless excepted by law from only that part of the act requiring license from the Board of Medical Examiners; in other words, that all who practice any phase of the healing art are practicing

medicine but some are required to have a license from the Board of Medical Examiners and others are not. That construction would make them all "physicians" if, of course, "to practice medicine" has the same meaning in 84-901 and 42-802(2). An argument in favor of that view might be made by comparing several acts of the Legislature touching the practice of the healing art. The Medical Practice Act was passed in 1913. At that time the osteopathy statute was already in existence (1909). The chiropractic statute and the chiropody statute were later enacted, the former in 1921, the latter in 1933, Code, §§ 84-501 et seq., 84-601 et seq. All these statutes were incorporated in the Georgia Code. The Code is a single statute and each section is construed in the light of every other section. Barron v. Terrell, 124 Ga. 1077, 1078, 53 S.E. 181. However, where two sections are conflicting and both are derived from legislative acts, that section prevails which is derived from the later act. Williams v. W. & A. R. Co., 142 Ga. 696-(2), 83 S.E. 525; Staten v. State, 141 Ga. 82-(1), 80 S.E. 850.

The Act of 1913 required a license from the Board of Medical Examiners. Previously, by the Act of 1909, osteopaths had been classified as nondrug-giving and had not been engaged in the "practice of medicine", under the old definition as construed by the Court of Appeals. The Legislature, therefore, in 1913, it could be argued, realizing that osteopaths under the new definition would be engaged in "practicing medicine", and that the later act would control, excepted them from the operation of the act to the extent of not requiring them to be licensed by the Medical Board if they did not prescribe medicines or administer drugs. That means, by necessary implication, that after the Act of 1913, osteopaths would be required to have a license from the Board of Medical Examiners if they prescribed medicines or administered drugs. However, under the view being discussed, if osteopaths, under Code, § 84-901, were engaged in the practice of medicine, whether they used drugs or not, the only difference being that if they used drugs they had to have a license from the Medical Board, otherwise not, and if the words "to practice medicine" have the same meaning in 84-901 and in the state narcotic act (42-802(2), then the narcotic act being later could be said to limit the words in 84-906 so as to make them mean "nor to osteopaths not prescribing or using drugs or medicines, except narcotic drugs". In other words, the narcotic act is the latest act on the subject and under it a physician is authorized to use narcotics and a physician is one authorized to practice medicine, and if an osteopath is engaged in practicing medicine under 84-901, then he would be authorized by the latest act to use narcotic drugs, though not other drugs.

The Chiropractic Act authorized the practice of that profession by persons who were licensed by the Board of Chiropractic Examiners. That act, it could be said, conflicts with the Act of 1913 as to requiring a license from the Board of Medical Examiners and only to that extent prevails over the former act, and amounts to an exception to it. The act of 1921 expressly says that "chiropractors shall not prescribe or administer medicine to patients, perform surgery, nor practice obstetrics or osteopathy". Code, § 84-509. Now, if the Chiropractic Act had been in existence when the Act of 1913 was passed, the same result could have been accomplished by inserting in the Act of 1913 (Code, § 84-906) after the words "nor to osteopaths not prescribing medicines or administering drugs", the words "nor to chiropractors not prescribing or administering medicine," etc.

The Act of 1933 (Code, 84-6) defines chiropody, establishes a Board of Chiropody Examiners and authorizes the practice of chiropody upon obtaining of license from that board. That act being subsequent to the Act of 1913 and in conflict with it has the effect of excepting chiropodists from the necessity of obtaining a license from the Medical Board and, if that is the only respect in which it conflicts, could be said to leave chiropody still within the definition of practicing medicine in 84-901.

Likewise, the Optometry Act (1916) defines optometry, creates a Board of Examiners in Optometry to examine applicants and grant licenses to practice optometry. Code, § 84-1101 et seq. If optometry is comprehended in the definition of practicing medicine (84-901), still the Act of 1916, being later, would supersede that part of the Act of 1913 requiring a license from the Medical Board.

If the view just presented be correct, then all persons practicing any phase of the healing art, including medical doctors, osteopaths, chiropractors, chiropodists, and optometrists, would be engaged in practic-

ing medicine under the broad definition (84-901), some being excepted by law from the provision requiring license from the Medical Board.

However, that construction of the law leads into difficulties. The Code containing all these statutes is a single act and should be regarded, if possible, as a consistent and harmonious body of laws. Under the construction above suggested the practice of optometry would come within the broad definition in 84-901 and an optometrist would be engaged in practicing one phase of medicine, and yet the very act which authorizes the practice of optometry expressly prohibits the practice of medicine by an optometrist (84-1108). Evidently, therefore, the Legislature did not intend that 84-901 should include optometry.

Likewise, the chiropractic statute authorizes the practice of chiropractic but says a chiropractor shall not administer medicines or practice surgery, obstetrics or osteopathy, and then provides broadly (84-520) that the act "shall not be construed to interfere with any other method or science of healing." That must mean that chiropractic was not intended by the Legislature to be included in the definition of any other branch of healing, such as osteopathy, chiropody, or the "practice of medicine".

Other difficulties could be suggested. It becomes necessary, therefore, to harmonize, if possible, the statutes dealing with the healing art.

■■ The most reasonable construction is that in 1913 the Legislature intended to define the words "practicing medicine" so as to include every branch of the healing art and to require a license from the Medical Board, so as to prevent all unauthorized persons from practicing any branch of healing, and intended further that the definition should from time to time be limited by excluding from it any branch which had been or might later be expressly defined and authorized by law, so that any person not specifically authorized by law to practice some other branch of the healing art would be regarded as practicing medicine, if he in any way practiced healing, and would be violating the Act of 1913 if he had no license from the Medical Board. An exception from the operation of the Act of 1913 as to a prior act could be made only by inserting it in the Act of 1913 itself, but as to a later act the exception would arise from the superseding conflicting act. Only one act antedated the Medical Practice Act of 1913 and that was the osteopathy statute (1909). The exception of osteopaths in the Act of 1913, though contained in Code 84-906, which makes it criminal to practice medicine without a license, does not say that this "section" shall not apply to osteopaths, but says that nothing in this "Chapter" shall apply, which chapter includes Section 84-901, the definition of practicing medicine. In other words, osteopathy is excluded from the entire act, including the definition, so that an osteopath licensed to practice osteopathy is not practicing medicine if he uses no drugs. Even if the Act of 1909 could be said to have authorized the use of narcotics, still the Act of 1913 would have repealed that authority because it excepted osteopaths, only on condition that they use no drugs, thereby saying that, whatever their authority as to drugs may theretofore have been, they would now be subject to the Medical Practice Act if they used drugs.

■ The statutes dealing with optometry, chiropractic and chiropody were later than the Act of 1913 and had the effect of eliminating those professions from the definition of "practicing medicine", thereby leaving the definition applicable to all branches of the healing art, except such as are otherwise authorized by law.

■ Osteopaths, therefore, are not engaged in the practice of medicine and, while they may treat sick and injured human beings, they are not authorized to use drugs without a license from the Board of Medical Examiners. It follows that an osteopath is not a physician under 42-802(2) and is, therefore, not entitled to register under the Harrison Act.

3. That construction of the words "to practice medicine" would dispose of the case but let it be supposed that such construction is erroneous and that an osteopath is engaged in practicing medicine within the meaning of 84-901, then the question arises whether "to practice medicine" in that section has the same meaning as the same words in 42-802(2).

■ The same language in a later statute should be presumed to have the same meaning, unless a different meaning is required. Johnson v. State, 1 Ga.App.

195, 58 S.E. 265. If these words do have the same meaning and include the practice of osteopathy, then an osteopath is a physician. A holding to that effect, however, would result in unreasonable consequences:

(a) If an osteopath, within the meaning of 84-901, is engaged in the practice of medicine, so are chiropractors, chiropodists and optometrists, and if "to practice medicine" in 42-802(2) has the same meaning, then chiropractors, chiropodists and optometrists would be physicians and entitled to administer narcotic drugs. It is true that the Act of 1916 (Code, § 84-1108) and the Act of 1921 (Code, § 84-509) prohibit the use of drugs by optometrists and chiropractors, but the state narcotic act of 1935, being later, would repeal those prohibitions and would authorize the use of narcotics by all persons practicing the healing art. In view of the consistent purpose of the Legislature theretofore not to permit osteopaths, chiropractors, optometrists, etc., to administer drugs, it is not likely that, in passing the narcotic act of 1935, it intended to reverse that policy.

(b) If persons authorized "to practice medicine" in 42-802(2) includes all who practice the healing art as broadly defined in 84-901, then the latter part of 42-802(2), to-wit: "any other person authorized by law to treat sick and injured human beings in this State and to use narcotic drugs in connection with such treatment", is meaningless and adds nothing to the first part of that subsection. That is true for the reason that if a physician is a person authorized to practice medicine and that language includes all who practice the healing art, then no person could come within the latter part of the subsection who is not already included in the first part. One rule of statutory construction is that all words of a statute must be given due weight and meaning. Falligant v. Barrow, 133 Ga. 87, 92, 65 S.E. 149. It follows that, if an osteopath and all others practicing the healing art are included in 84-901, then the fact that the latter part of 42-802(2) is in the statute, is an argument that "to practice medicine" in the first part of that subsection refers only to those holding a license from the Medical Board and not to all who practice medicine as defined in 84-901.

(c) The state narcotic act states (42-822) that it shall be so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states which enact it. In some states the law might clearly define the practice of medicine so as to include only medical doctors such as in this state are licensed by the Medical Board and might authorize others to practice some branch of the healing art and to use narcotic drugs. In that event, all the language in 42-802(2) would have meaning. Therefore, whatever may be the meaning of "to practice medicine" in 84-901, the Legislature being concerned with uniformity very probably intended that the words "person authorized by law to practice medicine" in 42-802(2) should be construed to mean person licensed by the Medical Board and did not intend to change the law by permitting all practitioners of the healing art to use narcotic drugs, many of whom it had theretofore specifically denied that authority.

(d) In a Florida case, Perry v. Larson, 104 F.2d 728, the Fifth Circuit Court of Appeals construed the language of the Uniform Narcotic Act as meaning persons authorized to practice materia medica, which holding would seem to require the same language in this state to be construed as meaning persons licensed by the Board of Medical Examiners to practice medicine.

The conclusion, therefore, must be that even if the words "to practice medicine" in 84-901 are broad enough to include the practice of osteopathy, still the same words in 42-802(2) have a more limited meaning and do not include an osteopath.

4. The license granted by the Board of Osteopathic Examiners purports to authorize the practice of osteopathy, surgery and obstetrics. Plaintiffs contend that it is unreasonable to license the practice of surgery and obstetrics and to deny the use of drugs in such practice. They cite Bruer v. Woodworth, D.C., 22 F.2d 577, 580. The argument amounts to saying that the Act of 1909 authorizing the practice of osteopathy by necessary implication authorizes the use of narcotics. It might be proper by construction to cause a statute to say by implication something it does not say expressly, if nothing in the law prevents such construction. In the Bruer case, supra, the state law authorized a physician to use narcotics but apparently did not define "physician". The definition of "practicing medicine" in that state was broad enough to include osteopathy but the court found it impossible to construe that definition to mean what it said because, if

so, then the osteopathy statute would both authorize and prohibit the practice of osteopathy, that act expressly prohibiting the practice of medicine by an osteopath. The case was decided on the broad ground that any one practicing medicine, surgery, osteopathy, etc., was authorized to use any usual and recognized agency for the accomplishment of their respective ends and that it would require a positive prohibition to prevent the use of narcotics by such practitioners. However, in Georgia the Medical Practice Act of 1913 excepts osteopaths from its operation only if they do not use drugs. An implied authority cannot prevail over an express prohibition.

The Legislature having denied osteopaths the use of drugs and drugs being apparently necessary in the practice of surgery and obstetrics, it might be queried whether the Board of Osteopathic Examiners does not exceed its statutory authority in granting a license to practice surgery and obstetrics. It is true that applicants are examined in anatomy, physiology, chemistry, toxicology, pathology, diagnosis, hygiene, obstetrics, gynecology, surgery, medical jurisprudence, principles of osteopathy, and such other subjects as the Board may require. However, the license authorized by 84-1209 does not ·necessarily include everything embraced in the examination. The license authorizes only the practice of osteopathy, which the same act classifies as a drugless school of practice. It may be necessary for an osteopath to know numerous subjects in order to make a diagnosis and to determine whether osteopathic treatment or some other treatment is indicated. He should know when not to give an osteopathic treatment.

A chiropractor is examined in anatomy, physiology, symptomatology, pathology, physical diagnosis, neurology, chemistry, hygiene and sanitation, chiropractic orthopedy, nerve tracing and adjusting, as taught in chiropractic schools. His license, however, authorizes only the adjustment of patients (84-509). His knowledge must be broader than his practice; he must know what he practices but may not practice all he knows.

Again, chiropody is defined (84–601) as the diagnosis, medical, surgical, mechanical, manipulative and electrical treatment limited to ailments of the foot. But the examination of applicants includes histology, dermatology, anatomy, physiology, chemistry, bacteriology, pathology, diagnosis and treatment, materia medica and therapeutics, clinical chiropody. The license of a chiropodist is much more limited than his examination and he can use no anaesthetic other than local.

Another indication that surgery and obstetrics were not intended to be included in an osteopath's license is found in the chiropractic statute (84-509). There it is said that chiropractors shall not "perform surgery, nor practice obstetrics or osteopathy". If osteopathy includes surgery and obstetrics, then the express reference to surgery and obstetrics is surplusage and adds no meaning to the statute. All words in a statute are supposed to have meaning.

One of two things may be true: that the Legislature in passing the Act of 1909 either did not intend to authorize the practice of surgery and obstetrics, or intended to authorize only such of that practice as could be done without drugs.

In any event, the legislative intent to prohibit the use of drugs is too clear to be overridden by the argument of necessity.

The construction herein given seems to be the only one which will avoid inconsistencies and harmonize the state statutes. Briefly restated, it is that the definition in 84-901 is broad enough to include every branch of practice; that if no other branch were now authorized by law, then all practitioners would not only come within the definition but would be subject to all the Medical Practice Act of 1913, including the requirement of license from the Medical Board; that as soon as any branch of healing is otherwise expressly authorized by law, then that branch is no longer subject to the Act of 1913 but is excepted, not only from the requirement of license by the Medical Board, but also from the definition itself of "practicing medicine"; that the practitioner of such excepted branch is no longer practicing medicine within the meaning of 84-901; that the purpose was to prevent the practice of healing in any way except by those expressly authorized; that the practice of medicine in 42-802(2) refers only to physicians licensed by the Medical Board; that osteopaths, not being engaged in the practice of medicine and being prohibited to use drugs without a license from the Medical Board, are not physicians within the meaning of the state narcotic act and are, therefore, not entitled to register under the federal narcotic act.

A judgment will be entered accordingly.